UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER GRATZ and PATRICK
HAMACHER, for themselves and all others
similarly situated,

       Plaintiffs,                                   Case No. 97-75231

v.                                                    Honorable Patrick J. Duggan

LEE BOLLINGER, ET AL.

       Defendants,

       and

EBONY PATTERSON, ET AL.

       Intervening Defendants.
_____/

## OPINION

On October 14, 1997, Plaintiffs Jennifer Gratz and Patrick Hamacher– both of whom are Caucasian– filed this class-action lawsuit asserting that the admissions policy of the University of Michigan's ("University") College of Literature, Science, and the Arts ("LSA") violated the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d), and 42 U.S.C. § 1981. Plaintiffs sought, *inter alia*, compensatory and punitive damages for past violations, declaratory relief finding that Defendants violated their rights to nondiscriminatory

1

treatment, an injunction prohibiting Defendants from continuing to discriminate on the basis of race in violation of the Fourteenth Amendment, and an order requiring the LSA to offer Plaintiff Hamacher admission as a transfer student.

In a decision issued on December 13, 2000, this court held the LSA's admissions policies for the years 1995-1998 unconstitutional. *Gratz v. Bollinger*, 122 F. Supp. 2d 811 (E.D. Mich. 2000). While the court held that it was proper to consider race in the admissions process in order to achieve diversity in the student body, the court concluded that the LSA's policy of reserving seats for under-represented minority applicants during those years operated as the functional equivalent of a quota and therefore ran afoul of *Regents of the University of California v. Bakke*, 438 U.S. 365, 98 S. Ct. 2733 (1978). *Gratz*, 122 F. Supp. 2d at 832. The court upheld the LSA's program from 1999 forward, however, finding the school's consideration of race narrowly tailored to achieve its goal of achieving a diverse student body. *Id*. at 831. On June 23, 2003, the Supreme Court reversed this court's holding with respect to the admissions program for 1999 forward, finding the program not narrowly tailored and therefore unconstitutional. *Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411 (2003). The Court remanded the action for further proceedings consistent with its opinion. *Id*.

At a meeting with the parties following the Supreme Court's decision and remand, the court directed the parties to brief the following issues: (1) whether Plaintiffs have standing to pursue their claims for retrospective relief; (2) if so, what legal standard applies to determine liability; and (3) which party bears the burden of proof with respect

to liability. Damages issues remain with respect to Plaintiffs' claims for injunctive and prospective relief; however, the court will address those issues at a later date. Some background information is necessary with respect to the issues now before the court.

### Factual and Procedural Background

Plaintiff Gratz applied for admission to the LSA for the Fall of 1995. On January 19, 1995, the LSA notified her that a final decision regarding her admission had been delayed until early to mid-April 1995, as she was considered by the LSA as "well qualified, but less competitive than those students who ha[d] been admitted on first review." In other words, Gratz was wait-listed. On April 24, 1995, the LSA notified Gratz that it was not able to offer her admission. Gratz thereafter enrolled in the University of Michigan at Dearborn, from which she graduated in 1999.

Plaintiff Hamacher applied for admission into the 1997 class of the LSA. The LSA notified Hamacher on November 19, 1996, that a decision regarding his admission was postponed until mid-April of 1997. Hamacher was told that a decision regarding his admission had been postponed because "although his academic credentials were in the qualified range, they were not at the level needed for first review admission." On April 8, 1997, the LSA rejected Hamacher and he subsequently enrolled at Michigan State University.

The LSA's admissions programs in 1995 and 1996 were based primarily on a set

of guideline tables referred to as grids, with "GPA 2"[1] ranges represented on the vertical axis and ACT/SAT scores represented on the horizontal axis. In 1995, four grids were used: (1) in-state, non-minority applicants; (2) out-of-state, non-minority applicants; (3) in-state, minority applicants; and (4) out-of-state, minority applicants. In 1996 only two grids were used: (1) in-state and legacy applicants and (2) out-of-state applicants. An applicant's race and/or ethnicity were designated by non-minority applicant action codes listed in the top row of the grid's cells and minority applicant action codes listed in the bottom row. In 1997, the same grids as in 1996 were used; however, the LSA also added .5 points to under-represented minority applicants' GPA 2 scores.[2]

As this court previously found, *Gratz v. Bollinger*, 122 F. Supp. at 832, the LSA used facially different grids and action codes based solely upon an applicant's race. Under these differing grids, a certain group of non-preferred applicants were automatically excluded from competing for a seat in the class without any type of individual counselor review based solely on their grades and test scores. In comparison,

---

[1] An applicant's "GPA 2" was calculated by adjusting his or her high school GPA based upon several factors, including the quality of the applicant's high school, the strength of the applicant's high school curriculum, any unusual circumstances, the applicant's geographical residence, and the applicant's alumni relations, if any.

[2] As discussed *infra*, the court previously certified a class; however, that class was certified for injunctive and declaratory relief only. With respect to Plaintiffs' claims for retrospective relief, no class has been certified. Therefore since Gratz and Hamacher– the only named plaintiffs– applied for admission in 1995 and 1997, respectively, the LSA's admissions programs post-1997 are not relevant at this time to the issues discussed in this opinion. A description of those programs, however, can be found in this court's decision of December 13, 2000. *Gratz v. Bollinger*, 122 F. Supp. 2d at 827.

preferred minority applicants never were automatically rejected, regardless of their grades and test scores, but instead received some type of individualized counselor review. Thus for example, in 1995 and 1996, a non-minority applicant with a GPA 2 of 2.3-3.3 and an ACT score of 18-20/SAT score of 400-500 would be automatically rejected, whereas a minority applicant with the same grade/score would have received some type of individualized counselor review.

Because admissions for the LSA are determined on a rolling basis, the LSA designates a certain number of seats during the admissions cycle for in-state students and for certain other groups of students, such as athletes, foreign applicants, and under-represented minority candidates. If these spaces are not filled by qualified candidates from the designated groups toward the end of the admission season, the LSA uses those seats to admit students from the postponed pool or the extended waiting list.

On December 23, 1998, this court issued an Order certifying a class and bifurcating the proceedings into a liability phase and a damages phase. The court certified a class consisting of "those individuals who applied for and were not granted admission to the [LSA] for all academic years from 1995 forward and who are members of those racial or ethnic groups, including Caucasian, that [D]efendants treat[ed] less favorably on the basis of race in considering their application for admission." *See* Op. dated 12/23/1998 at 15; *see also Gratz v. Bollinger*, 122 F. Supp. 2d at 814 n.2. As the court clearly stated in its Order granting class certification, the claims of the class are limited to injunctive and declaratory relief only. *Id*. The court explained that during the

5

liability phase, it would determine "whether Defendants' use of race as a factor in admissions decisions violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution." *See id.*

The parties subsequently filed cross-motions for summary judgment with respect to liability. Plaintiffs asserted that Defendants' use of race as a factor in admissions to the LSA violated Title VI, Section 1981, and the Equal Protection Clause of the Fourteenth Amendment. Relying on Justice Powell's opinion in *Bakke*, 438 U.S. 265, 98 S. Ct. 2733 (1978), Defendants responded that the consideration of race as a factor in admissions decisions might serve a compelling government interest in some cases and the LSA had such an interest in the educational benefits that result from having a racially and ethnically diverse student body. Defendants further argued that the LSA's admissions policies were narrowly tailored to achieve that interest.

This court concluded that Defendants presented "solid evidence" that a racially and ethnically diverse student body produces significant educational benefits such that achieving such a student body constitutes a compelling governmental interest. *Gratz*, 122 F. Supp. 2d at 822. The court further concluded, however, that the admissions policies Defendants utilized from 1995 through 1998 were not narrowly tailored to achieve that interest. *Id.* at 831-33. The court reached a different result with respect to the policy Defendants began using in 1999. *Id.* at 831. Because the court found that the new policy did not utilize rigid quotas, seek to admit a predetermined number of minority students, or establish a two-track system for applicants, the court held that it was narrowly tailored to

6

achieve the University's compelling interest in a diverse student body. *Id*. at 828-31.

Based on these findings, the court granted Plaintiffs' motion for summary judgment with respect to the admissions programs in existence from 1995 through 1998, and granted Defendants' motion with respect to the admissions program from 1999 forward. *Id*. at 836. Because the court ruled that the current admissions policy was constitutional, it denied Plaintiffs' request for injunctive relief. *Id.*

The court subsequently certified two questions for interlocutory appeal to the Sixth Circuit pursuant to 28 U.S.C. § 1292(b). The Sixth Circuit permitted the appeal and granted Plaintiffs' subsequent motion for initial hearing *en banc.* The appellate court scheduled oral argument for December 6, 2001, the same day as the hearing in *Grutter v. Bollinger*– a class-action lawsuit raising identical challenges to the University's law school admissions policies.

On May 14, 2002, the Sixth Circuit issued its decision in *Grutter*. 288 F.3d 732 (6th Cir. 2002). In its opinion, the court indicated that it would separately render its decision in *Gratz* in a "forthcoming opinion." *Id*. at 735 n.2  On October 1, 2002, because the Sixth Circuit had not issued an opinion in this case and a petition for writ of certiori from the Supreme Court already was pending in *Grutter*, Plaintiffs petitioned the Supreme Court for a writ of certiori before judgment. The Supreme Court granted the petition on December 2, 2002. *Gratz*, 537 U.S. 1044, 123 S. Ct. 602 (2002). The Supreme Court heard separate arguments in *Gratz* and *Grutter* on April 1, 2003.

On June 23, 2003, the Supreme Court issued opinions in both cases. *Gratz v.*

*Bollinger*, 539 U.S. 244, 123 S. Ct. 2411 (2003); *Grutter v. Bollinger*, 539 U.S. 982, 124 S. Ct. 35 (2003). As the Supreme Court set forth in its opinion in this case, Plaintiffs raised two arguments in their challenge to this court's opinion granting summary judgment to Defendants. First Plaintiffs argued that the consideration of race in undergraduate admissions always violates the Fourteenth Amendment unless used to remedy identified past discrimination. *Gratz*, 539 U.S. at 268, 123 S. Ct. at 2426. Alternatively, Plaintiffs argued that even if the University's interest in diversity can constitute a compelling state interest, use of race in its admissions program was not narrowly tailored to achieve such an interest. *Id*.

The Supreme Court rejected Plaintiffs' first argument, referring to its holding in *Grutter* that a university's interest in a racially and ethnically diverse student body is a compelling interest that may justify the consideration of race in the admissions process. *Id*. at 268-69, 123 S. Ct. at 2426-27 (citing *Grutter*, 539 U.S. at 328-331, 123 S. Ct. at 2338-41). The Supreme Court agreed with Plaintiffs, however, that the LSA's admissions program for 1999 forward was not narrowly tailored to achieve that compelling interest. The Court therefore held that the program violated the Equal Protection Clause of the Fourteenth Amendment, Title VI, and Section 1981. *Id*. at 269-75, 123 S. Ct. at 2427-30.

## Standing

Defendants argue that Gratz and Hamacher lack standing to pursue their claims for prospective relief. Relying on the Supreme Court's per curiam decision in *Lesage v.*

*Texas*, 528 U.S. 18, 120 S. Ct. 467 (1999), and subsequent cases applying *Lesage* to non-minority applicants' challenges to college admissions or government hiring programs, Defendants contend that Gratz and Hamacher only have standing if they can establish that they would have been admitted under a lawful admissions program. Plaintiffs claim they have standing because Defendants' unlawful admissions policies denied them the right to compete on an equal footing with minority applicants. In other words, regardless of whether they were denied admission as a result of Defendants' unconstitutional consideration of race or because of their failure to meet other criteria for admission, Plaintiffs argue that they have standing to pursue their claim for retrospective relief simply because their applications were evaluated under an unconstitutional admissions system.

  Article III of the Constitution limits federal court jurisdiction to "cases" and "controversies." U.S. CONST. art. III, § 2. Inherent in this "case" or "controversy" requirement is the doctrine of standing. The question of standing relates to whether a particular plaintiff has alleged a sufficient personal interest in the outcome of a controversy "to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205 (1975). "[T]he fact that 'a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Gratz*, 539 U.S. at 289, 123 S.

Ct. at 2438 (Stevens, J., dissenting)(quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)). While the doctrine of standing appears straight-forward, it frequently has been identified by judges and commentators as "one of the most confused areas of the law" or alternatively as "a morass of imprecision." *See* Erwin Chemerinsky, *Federal Jurisdiction*, § 2.3 (2d ed. 1994); *Comfort v. Lynn Sch. Comm.*, 150 F. Supp. 2d 285, 295 n.24 (D. Mass. 2001)(quoting *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 12 (1st Cir. 1996)).

Courts and commentators agree, however, that at a constitutional minimum, standing requires a plaintiff to satisfy three things. First, the plaintiff must show that he or she has suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992); *Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002). The injury must arise out of "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136 (internal citations and quotations omitted). Second, the plaintiff must show a causal connection between the asserted injury and the challenged action of the defendant. *Id.*; *Aiken*, 281 F.3d at 519. Third, the plaintiff must show that it is likely that "the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61, 112 S. Ct. at 2136-37; *Aiken*, 281 F.3d at 519. A plaintiff must satisfy all three of these requirements for each claim *and* for each form of relief sought. *Donahue v. City of Boston*, 304 F.3d 110, 116 (1st Cir. 2002)(citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 210-211, 115 S. Ct. 2097, 2104 (1995)).

To establish standing in a case in which the plaintiff is seeking *prospective* relief, the plaintiff need only demonstrate that he or she has been denied the opportunity "to compete on an equal footing." *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, 113 S. Ct. 2297, 2308 (1993). However, to establish standing where a plaintiff is seeking *retrospective* relief, the plaintiff must show that he or she would have received the benefit at issue absent the defendant's consideration of race. As the *Lesage* Court stated:

> [W]here a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983.
>
> Of course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered. The relevant injury in such cases is 'the inability to compete on an equal footing.' . . . But where there is no allegation of an ongoing or imminent constitutional violation to support a claim for forward-looking relief, the government's conclusive demonstration that it would have made the same decision absent the alleged discrimination precludes any finding of liability.

528 U.S. at 21, 120 S. Ct. at 468-69.

Following *Lesage*, the Sixth Circuit in *Aiken* held that Caucasian police officers did not have standing to challenge the promotions program for police sergeants used by the City of Memphis, Tennessee, because the plaintiffs could not show that they would have received promotions under a race-neutral policy. 281 F.3d 516 (6th Cir.), *cert.*

*denied sub nom. Ashton v. City of Memphis*, 537 U.S. 817, 123 S. Ct. 87 (2002). The court explained:

> If the plaintiffs allege that a racial preference cost them some benefit under a government program, those plaintiffs may have alleged an injury in fact. But if those same plaintiffs cannot also allege and show that "under a race-neutral policy" they would have received the benefit, those plaintiffs have not alleged an injury in fact because they have not alleged an invasion of some interest that the law protects. *Texas v. Lesage*, 528 U.S. 18, 20, 120 S. Ct. 467 . . . Those plaintiffs lack Article III standing.

*Id*. at 519. The First Circuit applied the same standing analysis in *Donahue v. City of Boston*, 304 F.3d 110 (1st Cir. 2002). As the *Donahue* court read *Lesage*, there are "crucial analytical differences between [a claim for retrospective relief and a claim for prospective relief]" for standing purposes:

> We think that *Lesage* is a clear cue from the Supreme Court that we cannot apply identical standing analyses to claims for damages and claims for prospective relief. It is equally apparent, in light of Lesage, that the "equal footing" analysis is applied only in claims for the latter type of relief. Our standing inquiry on the claim for damages therefore asks whether [the plaintiff] can demonstrate that, under a race-neutral policy, he would have received the benefit for which he now seeks compensation.

Id. at 116.

This court is bound by the interpretation of *Lesage* adopted by the Sixth Circuit in *Aiken*. Plaintiffs criticize this approach as conflating the standing inquiry with resolution of the merits. However the court believes that any standing inquiry overlaps significantly with a resolution of the merits of the plaintiff's case, as standing always requires a litigant

to show that he or she is entitled to relief in order to "walk through the courthouse door." *Lesage* clearly holds that to be entitled to retrospective relief in a case such as this one, the relevant injury-in-fact is not the ability to compete on an equal footing, but rather the applicant's ability to succeed absent the unlawful conduct. What proof a litigant must offer to establish his or her standing depends on the stage in the proceedings at which a challenge to his or her standing is raised.

As the Eleventh Circuit explained in *Bischoff v. Osceola County*, 222 F.3d 874 (2000), "each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Id*. at 878 (quoting *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136). Therefore, as the *Bischoff* court further explained:

> [W]hen standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing. However, when standing is raised at the summary judgment stage, the plaintiff can no longer rest on 'mere allegations.' [*Lujan*, 504 U.S.] at 561, 112 S. Ct at 2137. Instead, the plaintiff must " 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true."

*Id*.

In *Aiken* and *Donahue*, the courts addressed the plaintiffs' standing in the context of motions for summary judgment. Finding no factual dispute with respect to whether the plaintiffs' rejections were on account of the defendants' use of racial preferences, the courts granted summary judgment to the defendants based on the plaintiffs' lack of

13

standing.  *See also Cotter v. City of Boston*, 323 F.3d 160 (1st Cir. 2003)(granting summary judgment to the defendant based on the plaintiffs' inability to prove standing as the city's race-neutral ranking system resulted in plaintiffs being so far down the applicant list that their applications were not impacted when the city departed from rank order in order to promote more minority candidates).  At this time in the present case, however, no summary judgment is pending and Plaintiffs have alleged facts in their complaint to support the necessary requirements of standing under *Aiken*.  *See* Compl. ¶¶ 25-26.

As discussed previously, Defendants are correct that Plaintiffs must prove each element of standing.  If Defendants file a motion for summary judgment challenging Plaintiffs' standing, the Court will apply *Aiken*'s analysis to determine whether Plaintiffs have standing.  As *Aiken* holds, Plaintiffs must "allege and show that 'under a race-neutral policy' they would have received the benefit" [i.e. admission].  281 F.3d at 519.  If the court finds a genuine issue of fact with respect to the three requirements necessary for Plaintiffs to establish standing or if Defendants do not file a motion, the court only will consider whether Plaintiffs have met their burden– as the First Circuit suggested in *Donahue*– when Plaintiffs ultimately set forth evidence to establish Defendants' liability.  304 F.3d at 119.

### Standard for Assessing Liability and the Applicable Burden of Proof

Plaintiffs successfully demonstrated that the LSA's admissions policies were unconstitutional.  This finding, however, does not necessarily lead this court to find that

Defendants are liable to Plaintiffs on their claims for retrospective relief. To determine Defendants' liability, the court must consider the relevant injury and test for liability set forth in *Lesage*. As the Supreme Court held in that case, when a plaintiff seeks retrospective relief, the relevant injury for determining the defendant's liability is whether or not the plaintiff would have received the benefit at issue absent the defendant's unlawful consideration of certain criteria such as race. *Id.* at 21, 120 S. Ct. at 468.

As *Mt. Healthy* provides, Plaintiffs must establish by a preponderance of the evidence that Defendants' unconstitutional consideration of race played at least "a *substantial* factor" or a "*motivating* factor" in the rejection of Plaintiffs' applications. *Mt. Healthy*, 429 U.S. at 287, 97 S. Ct. at 576 (emphasis added); *see also Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 712 (6th Cir. 1985). If Gratz and Hamacher are able to make this showing, Defendants may avoid liability by demonstrating that the University would have reached the same decision with respect to their applications if it had not used the admissions policy the Supreme Court deemed unconstitutional.

Plaintiffs and Defendants agree that *Mt. Healthy*'s burden shifting framework is the proper framework for analyzing Plaintiffs' claims for retrospective relief. Plaintiffs assume, however, that they already have proven Defendants' liability by showing that their applications were subjected to race-conscious considerations during the admissions process. Plaintiffs therefore argue that the burden now is upon Defendants to show that Plaintiffs would have been rejected even absent the LSA's unlawful consideration of race.

Defendants, on the other hand, contend that Plaintiffs have not established all the elements necessary to satisfy their initial burden under *Mt. Healthy*. The court agrees with Defendants.

In *Mt. Healthy*, the Supreme Court describes the test for liability as follows:

> Initially . . . the burden was properly placed upon [the plaintiff] to show that his conduct was constitutionally protected, *and* that this conduct was a "substantial factor" or to put it in other words, that it was a "motivating factor" in the [defendant's] decision not to rehire him. [Plaintiff] having carried that burden, however, the [d]istrict [c]ourt should have gone on to determine whether the [defendant] had shown by a preponderance of the evidence that it would have reached the same decision as to [plaintiff's] reemployment even in the absence of the protected conduct.

*Mt. Healthy*, 429 U.S. at 287, 97 S. Ct. at 576 (emphasis added). In *Blalock*, the Sixth Circuit summarized the plaintiff's burden in the context of a race discrimination claim as: "Under *Mt. Healthy,* a plaintiff must show by a preponderance of the evidence that his race . . . was a 'motivating factor' in the employer's decision to discharge him." *Blalock*, 775 F.2d at 712. Only then does the burden shift to the defendant "to prove that the adverse employment action would have been taken even in the absence of the impermissible motivation and that, therefore, the discriminatory animus was not the cause of the adverse employment action." *Id.* Citing to *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996), Plaintiffs argue that they have met their initial burden under this framework.

In *Hopwood*, the Fifth Circuit determined that the plaintiff satisfied his burden to establish liability under *Mt. Healthy*'s framework because there was no question that the

16

plaintiff had been denied the opportunity to compete on an equal footing. *Id*. The court made this determination, however, without the benefit of the Supreme Court's subsequent instruction in *Lesage* that courts must distinguish between retrospective claims for damages and forward-looking claims for injunctive relief in determining the relevant injury that a plaintiff must establish. As the *Lesage* Court further instructed, the plaintiff seeking retrospective relief must show that the defendant's use of unlawful racial preferences was a "motivating factor" or "substantial factor" in its denial of the plaintiff's application.[3] Because *Hopwood* preceded *Lesage*, the Court does not find it persuasive. The court in *Johnson v. Board of Regents of University System of Georgia*, 106 F. Supp. 2d 1362 (S.D. Ga. 2000), relied on *Hopwood* and therefore also incorrectly identified the relevant injury in fact when a plaintiff seeks retrospective relief. Thus the court does not find it persuasive, as well.

Plaintiffs in this case have yet to show by a preponderance of the evidence or otherwise that the LSA's consideration of race was a "motivating" or "substantial" factor

---

[3] It is interesting to note the district court's comments on remand in *Hopwood* with respect to the Fifth Circuit's interpretation of the plaintiffs' burden of proof under *Mt. Healthy*. *See Hopwood*, 999 F. Supp. 872, 883 (W.D. Tex. 1998). Without the benefit of the Supreme Court's decision in *Lesage*– which was issued the following year– Judge Sparks believed the plaintiffs should have been required to prove that they were denied some right or benefit as a direct result of the defendant's use of unlawful racial preferences. *Id*. Although recognizing his obligation to follow the Fifth Circuit's ruling, Judge Sparks wrote: "The Fifth Circuit's analysis in this regard was incomplete at best; at worst, it was a misapplication of the *Mt. Healthy* framework because it presupposed that race was a substantial or motivating factor in every nonminority applicant's denial of admission to the law school in 1992, regardless of the applicant's qualifications to enter law school. As a matter of common sense and rudimentary mathematics, that cannot be the case." *Id*.

17

in their rejections. Plaintiffs have shown that they were sufficiently qualified to make the LSA's waiting list. At this point, however, Plaintiffs have not established– nor has there been any need for them to do so– that but for the LSA's consideration of race they would have been accepted immediately instead of being placed on the waiting list or that they eventually would have been selected for an opening in the freshman class. The LSA receives applications from many more qualified non-minority applicants than it has spaces to fill in its freshman classes. Thus even if the LSA rejected all non-minority applicants at the outset, it appears it still would not be able to offer a slot in its freshman class to every qualified non-minority applicant. For that reason, the court cannot presume that every qualified, non-minority applicant was rejected because of the LSA's consideration of race in its admissions programs.

In short, while Plaintiffs have demonstrated that the LSA's admissions policies were unconstitutional, they have not demonstrated their entitlement to retrospective relief as a result of this unconstitutional conduct. To establish Defendants' liability, *Mt. Healthy* clearly provides that Plaintiffs initially must prove by a preponderance of the evidence that they were injured– i.e. denied admission to the LSA– and that Defendants' unlawful conduct was a substantial or motivating factor in their rejection. *Mt. Healthy*, 429 U.S. at 287, 97 S. Ct. at 576. The fact that Hamacher's and Gratz' race may have been considered in the application process is not enough to demonstrate Defendants' liability.

The court believes its above analysis addresses the three issues the court directed

18

the parties to brief, including the legal standard applicable to Defendants' burden under *Mt. Healthy* in light of the Supreme Court's holding.

**SO ORDERED**.

_____
Date: August 5, 2005                                    s/PATRICK J. DUGGAN
                                                                       UNITED STATES DISTRICT JUDGE

Copies to:
Kirk O. Kolbo, Esq.
Michael E. Rosman, Esq.
Kerry L. Morgan, Esq.
Leonard M. Niehoff, Esq.